UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STEPHANIE GAISER,

        Plaintiff,

v.

AMERICA'S FLOOR SOURCE,

        Defendant.

Case No. 2:18-cv-1071
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Defendant America's Floor Source's ("Defendant")
Motion for Summary Judgment (ECF No. 14). Plaintiff Stephanie Gaiser ("Plaintiff") has
responded (ECF No. 18) and Defendant has replied (ECF No. 19). Thus, the motion is ripe for
review. For the following reasons, Defendant's Motion for Summary Judgment (ECF No. 14) is
**DENIED**.

## I.

Defendant is a flooring company that installs flooring in private residences and commercial
businesses. (Def.'s Mot. Summ. J. at 3, ECF No. 14.) Defendant hired Plaintiff on August 1,
2016. (Gaiser Dep. 22:21–22, ECF No. 14-2.) Defendant's owner Jason Goldberg, and its
president Tim Henson, were both involved in hiring Plaintiff. (Hoffer Dep. 42:17–21, ECF No.
18-1.) Mr. Goldberg and Mr. Henson hired Plaintiff because she had previous experience in retail
and home improvement due to working at Field and Stream and Home Depot. (Gaiser Dep. 25:12–
13; Hoffer Dep. 49:16–22.) Plaintiff's starting salary was $48,000. (Gaiser Dep 32:7–8.) During
Plaintiff's time working for Defendant she received a raise and two bonuses. (*Id.* at 134:8–10.)

Defendant's employees received 48 hours paid time off ("PTO") as well as 80 hours of vacation time. (*Id.* at 129:22–130:1.)

Defendant hired Plaintiff into the installation department as an installment manager. (Oste Dep. 32:10–12; Hoffer Dep. 19:10, 53:16–19; Gaiser Dep. 34:9–10.) Defendant's installation department receives purchase orders, verifies the warehouse can fill orders, and then works with installers to install flooring and complete orders. (*See* Woods Dep. 20:18–22:3, ECF No. 14-1.) Installation assistants receive orders, process paperwork, and verify orders are ready for installation managers. (*See id.*) Installation managers are responsible for recruiting, selecting, and managing the installers in the installation of flooring. (*See id.*) Installation managers begin by doing the work of installation assistants. (Hoffer Dep. 61:5–10.) As installation assistants, they gradually obtain more duties, and eventually become installation managers. (*Id.*) As such, when Plaintiff began working for Defendant, she performed the duties of an installation assistant. (*Id.* at 61:1–5.)

Plaintiff's direct supervisor was David Oste, the vice president of Defendant's Columbus operations. (*Id.* at 34:14–15; Oste Dep. 10:11–12, ECF No. 14-3.) Mr. Oste reported to Gina Hoffer, Defendant's executive vice president. (Hoffer Dep. 7:12.) Mr. Oste managed the installation department, as well as four other departments. (Oste Dep. 10:18–20.) In addition, Mr. Oste performed installation manager duties. (Hoffer Dep. 43:7–10.) Prior to Plaintiff's hire, Mr. Oste was seeking an employee to perform his installation manager duties so he could focus on the warehouses. (*Id.* at 43:10–12.) Mr. Henson and Mr. Goldberg hired Plaintiff, in part, to relieve Mr. Oste of his installation manager duties. (*Id.* at 43:6–7.)

During Plaintiff's employment with Defendant, it used a "GTRS" system to review its employees' performances. (Oste Dep. 16:7–11.) GTRS stood for goals, tasks, reoccurring tasks,

2

and employee summary. (*Id.* at 15:1–20.) Each month, Defendants' employees completed a GTRS and gave it to their manager. (15:24–16:2; Hoffer Dep. 68:10.) Defendants' managers reviewed the GTRSs and "if there [was] anything that need[ed] to be addressed, [the managers] tr[ied] to address it informally[,] face to face." (Oste Dep. 16:1–6.) Defendant's managers asked their employees to add goals to their GTRSs if there was a goal they wanted them to reach. (*Id.* at 19:3–5.) The GTRSs guided employees in working through their various tasks each month. (Hoffer Dep. 69:16–20.) Plaintiff completed the GTRS monthly and Mr. Oste generally said they were "fine." (Gaiser Dep. 87:11–2.) Mr. Oste never gave Plaintiff negative feedback about her monthly GTRS. (*Id.* at 87:12–13.)

In March and April of 2017,[1] Plaintiff used PTO to care for her mother who was suffering from cancer. (Gaiser Dep. 54:9–14, 55:2–3; Hoffer Dep. 137:17–21.) Plaintiff also used PTO for a trip to Alaska from June 24, 2017 to August 2, 2017. (Gaiser Dep. Ex. E.) Plaintiff used all her PTO for these purposes. (Gaiser Dep. 55:15–16; Hoffer Dep. 141:5–6.)

In August of 2017,[2] Defendant held its annual "Strategy Saturday." (Hoffer Dep. 119:7–8.) Strategy Saturday was an annual meeting where Defendant's managers developed a business plan for the upcoming year. (Hoffer Dep. 27:17–20.) During the 2017 Strategy Saturday, the managers spoke of the upcoming opening of a new facility. (Oste Dep. 19:22–23.) The opening of the new facility required a "shuffling of responsibilities" due to some employees leaving the old facility for the new facility. (*Id.* at 21:22–22:6.)

---

[1] There does not appear to be testimony or other evidence of the exact dates she used this leave. (*See* Gaiser Dep. Ex. E.)

[2] Neither Mr. Oste nor Ms. Hoffer, both attendees of the 2017 Strategy Saturday, testified to the exact date of the meeting. Ms. Hoffer stated Strategy Saturday "usually takes place about the last week of August." (Hoffer Dep. 119:14.) The document created for Strategy Saturday does not have a date on it. (*See* Oste Dep. Ex. D.)

Ms. Hoffer created a document entitled "Growth & Diversification" for the 2017 Strategy Saturday. (Hoffer Dep. 120:24–121:1; Oste Dep. Ex D.) The document stated the installation department's target goal for the upcoming year was to "function without Dave Oste being at his desk doing day to day duties." (*Id.*) It also stated under "[m]aking changes," that Ms. Hoffer "[r]ecommend[ed] letting Stephanie go." (*Id.*)

Ms. Hoffer testified that she recommended terminating Plaintiff in August of 2017, because she "felt that [Plaintiff] was not going to be able to do the installation manager job." (Hoffer Dep. 121:17–18.) Ms. Hoffer stated she did not terminate Plaintiff in August of 2017, however, because "Dave Oste felt he could work with [Plaintiff] and get her to a position where she would be able to step in and do" the installation manager job. (*Id.* at 121: 24–122:1.) Ms. Hoffer's document stated "[w]e will not make any of these moves until we hire a replacement for Stephanie. We are currently going through app[lication]s." (Oste Dep. Ex D.) Ms. Hoffer also testified that at this time, Mr. Henson gave his approval to terminate Plaintiff. (Hoffer Dep. 150:6–8.)

Mr. Oste's testimony as to why Plaintiff was not terminated at this time is slightly different. Mr. Oste testified that Ms. Hoffer asked him at the meeting whether he felt Plaintiff could take the position of installation manager and he said "no." (Oste Dep. 32:2–5.) He stated that "at that point we decided we need[ed] to go another route in order to fill [the] position" of installation manager. (*Id.* at 32:5–7.) Mr. Oste explained further, that at this point he did not feel like Plaintiff was "making the natural progression" from installation assistant to installation manager and he did not "feel like [he] could get her there." (*Id.* at 36:21–23.) Plaintiff, however, continued working for Defendant after the 2017 Strategy Saturday. (*Id.* at 37:2.)

In September of 2017, Plaintiff requested unpaid time off for a trip to New York. (Gaiser Dep. Ex. E.) Mr. Oste stated he could not approve more time off without first speaking to Ms.

Hoffer because Plaintiff had exhausted her PTO. (*Id.*) Mr. Oste later told Plaintiff he approved her time off request but "he did her a favor." (*Id.*)

Subsequent to Mr. Oste informing Ms. Hoffer that Plaintiff had requested more time off, Ms. Hoffer, Mr. Oste and Plaintiff had a conversation.[3] (Hoffer Dep. 138:19–21.) As Ms. Hoffer remembers the conversation, she first reminded Plaintiff she did not have any more time off. (*Id.* at 139:8–9.) Plaintiff responded she knew this but wanted to take unpaid time off. (*Id.* at 139:10–11.) Ms. Hoffer recalls Plaintiff explaining she had already bought nonrefundable tickets for her vacation. (*Id.* at 139:14–16.) Ms. Hoffer responded that while she did not want Plaintiff to lose the money she spent on this trip, "[she] want[ed] to make sure that [they] ha[d] an understanding that going forward . . . [Plaintiff] [could not] assume to just take unpaid days for personal vacation without talking to someone first." (*Id.* at 139:17–21.) Ms. Hoffer instructed Plaintiff "[not to] make reservations [or buy] flights until [she] talk[ed] to someone." (*Id.* at 1139:21–23.) Ms. Hoffer recalls that Plaintiff then reiterated that the previous days she had taken were for her family members' illnesses and she had needed to take those days off. (*Id.* at 140:9–15.) Ms. Hoffer responded with "it is what it is." (*Id.* at 140:20.)

As Plaintiff recalls the conversation, Ms. Hoffer "pretty much came out and told [her] that [she] had all of the time off that [she] was going to get and [Ms. Hoffer was] not going [to] approve any more." (Gaiser Dep. 58:1–4.) Plaintiff testified that after this conversation she "felt compelled to not take [time off] for retaliation reasons." (*Id.* at 130:14–17.) Plaintiff believed that "when [Ms. Hoffer] said [Plaintiff was] not approved for any more time off," she meant that if Plaintiff did take time off, she "would be in trouble, [i.e., she] would be written up." (*Id.* at 130:20–22.) Plaintiff admitted, however, that she never had a leave request denied. (*Id.* at 53:20–21, 54:2.)

---

[3] Plaintiff's statement to HR says the conversation only involved her and Ms. Hoffer. (Gaiser Dep. Ex. E.) Ms. Hoffer testified that Mr. Oste was also part of the conversation. (Hoffer Dep. 138:14–15.)

Following this exchange, Plaintiff gave a statement to Angie Hammer in the HR department because the exchange "made [her] feel very uncountable, [an she] felt threatened by [Ms. Hoffer's] statement and her tone." (Gaiser Dep. Ex. E.)

In November of 2017, after consulting with two surgeons, Plaintiff took FMLA leave to have foot surgery. (*Id.* at 56:22, 58:2–60:2, Ex. E.) Plaintiff's leave was from November 27, 2017, to January 17, 2018. (*Id.* at 56:23–25.) Prior to leaving, Plaintiff made a list of her daily duties and went over the list with Dustin Woods, an installation assistant Defendant hired in November of 2017. (*Id.* at 107:4–8; Woods Dep. 14:1–4, 22–24, ECF No. 22-1.) Mr. Woods performed Plaintiff's duties while Plaintiff was on leave. (Hoffer Dep. 80:4–6.) When Plaintiff returned, Mr. Woods was doing Plaintiff's job. Gaiser Dep. 81:7–11, 111:12–14.) Nonetheless, Plaintiff had the same pay and title as prior to her leave. (*Id.*)

On February 8, 2018, Defendant terminated Plaintiff. (*Id.* at 107:15–17.) Mr. Oste and Ms. Hoffer held a meeting and provided Plaintiff with a "Termination Record." (*See* Gaiser Dep. Ex. H.) The Termination Record stated that the "[r]eason for [t]ermination" was that "Stephanie was hired with the understanding that she possessed a skill set that she would, with training and a reasonable amount of time, take on the responsibilities of a manger. [Mr. Oste and Ms. Hoffer] have not felt that Stephanie has reached that level or will in the foreseeable future." (*Id.*)

Mr. Oste and Ms. Hoffer testified that they terminated Plaintiff because she was performing as an installation assistant but being paid as an installation manager. (Hoffer Dep. 125:10–12; Oste Dep. 31:19–24.) Mr. Oste testified Plaintiff "was not daily responsible for managing the installers, fixing all the on-site issues, recruiting installers, [and] training installers. She was processing paperwork, which [the] assistants do." (Oste Dep. 32:15–20.) Mr. Oste noted that the

list of duties Plaintiff had provided to Mr. Woods prior to her departure for FMLA leave was a list of almost exclusively installation assistants' duties. (*Id.* at 34:5–7.)

Mr. Oste also noted he had never given Plaintiff the responsibility to make the decisions installation managers made. (*Id.* at 34:23–23.) He stated this was because he "did not believe she would be successful with that job." (*Id.* at 35:8–9.) Thus, instead of assigning her installation manager duties, he "kept her busy with busy work." (*Id.* at 35:12.) Mr. Oste also noted that he gave Plaintiff no formal training. (*Id.* at 35:19–20.) He also never spoke with Plaintiff about his concerns. (*Id.* at 53:3.)

Mr. Oste explained that he was comfortable firing Plaintiff in February, and not in August of 2017 when he initially had concerns, because he "realized [Defendant] could function down a person." (*Id.* at 54:16–17.) Ms. Hoffer stated that upon Plaintiff's return from FMLA leave she asked Mr. Oste whether Plaintiff was taking any of his installation manager responsibilities. (Hoffer Dep. 77:7–8.) Mr. Oste said no. (*Id.* at 77:10.) Thus, "after 18 months [Plaintiff] had not taken anything off of Dave Oste's plate, which is what she was hired for. So[,] at that point [Ms. Hoffer and Mr. Oste] said it was time to part ways." (*Id.* at 77:13–15.)

Defendant did not replace Plaintiff immediately. (Oste Dep. 69:23–2.) The position was filled in August of 2018, though as a slightly different position. (*See id.*)

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has

the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n.*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III.

"The FMLA entitles qualifying employees to up to twelve weeks unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(D)). There are two theories upon which a party can recover under the FMLA: (1) the interference theory arising from Section 2615(a)(1),

which prohibits interfering with, restraining, or denying the exercise of any right provided under the FMLA; and (2) the discrimination theory, also known as the retaliation theory, arising from Section 2615(a)(2), which prohibits discharging, or in any other manner discriminating against, an individual for opposing any practice made unlawful by the FMLA. 29 U.S.C. § 2615(a)(1)–(2); *Edgar v. JAC Prod*s., 443 F.3d 501, 507 (6th Cir 2006); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). "Employers who violate these prohibitions are 'liable to any eligible employee affected' for damages and appropriate equitable relief." *Walton*, 424 F.3d at 485 (quoting 29 U.S.C. § 2617(a)(1)).

A violation of the FMLA may be established either by direct or circumstantial evidence. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). "Direct evidence of illegal discrimination is evidence that unlawful discrimination, if believed, would *require* the conclusion that unlawful discrimination was at least a motivating factor." *Walker v. JP Morgan Chase Bank, N.A.*, No. 3:13-cv-356, 2015 U.S. Dist. LEXIS 48335, at *27 (S.D. Ohio Apr. 13, 2015) (citing *id.*) (emphasis added).

When a plaintiff does not identify direct evidence of FMLA interference or retaliation then the burden-shifting framework from *McDonnel Douglas* is applied. *Id.; see also Donald v. Sybra, Inc.*, 667 F.3d 757, 761–62 (6th Cir. 2012); *Fields v. Fairfield Cty Bd. of Developmental Disabilities*, 507 F. App'x 554 (6th Cir. 2012). Thus, the burden is initially on the plaintiff to successfully show the prima facie case. *See id.* If the plaintiff succeeds, the burden shifts to the defendant to show a legitimate nondiscriminatory reason for its action. *See id.* If the defendant succeeds, the burden shifts back to the plaintiff to show the reasons offered by the defendant are pretext for unlawful conduct. *See id.* On a motion for summary judgment a district court considers

whether there is sufficient evidence to create a genuine issue of material fact at each stage of the *McDonnell Douglas* framework. *Id.*

## A. FMLA Retaliation Claim

To establish a prima facie case of retaliation the plaintiff must show:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). The burden of proof at the prima facie stage is minimal. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012); *see also Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) ("As an initial matter [a] plaintiff's burden in establishing a prima facie case is not intended to be an onerous one.") (internal citations omitted).

### 1. Plaintiff's Burden: Prima Facie Case

The first three elements are not disputed. Defendant argues Plaintiff cannot establish the fourth element, a causal connection between Plaintiff's FMLA activity and her termination. (Def.'s Mot. Summ. J. at 10.) Plaintiff argues she has created a genuine dispute of material fact as to whether there is a causal connection by providing evidence of: (a) the temporal proximity[4] between her use of FMLA leave and her termination; and (b) Defendant's anti-leave animus. (Pl.'s Resp. at 22.)

#### a. Temporal Proximity

Plaintiff argues the temporal proximity between her FMLA leave and her termination is evidence of a causal connection between her protected activity and adverse employment action.

---

[4] Plaintiff refers to this as the "sequence of events" or "timing sequence," but the Court will use the term temporal proximity to better align with the language used by Sixth Circuit, and district courts within the Sixth Circuit.

(Pl.'s Resp. at 17.) Plaintiff argues that the decision to discharge her was made in January of 2018, within weeks of her return from FMLA leave on January 17, 2018. (*Id.*) Plaintiff concedes that Ms. Hoffer recommended discharging her at what Plaintiff refers to as a "brainstorming session" in August of 2017, prior to her use of any FMLA leave. (*Id.*) Plaintiff asserts, however, the determinative decision was made in January of 2018. (*Id.*) As evidence of such, Plaintiff points to Mr. Oste's testimony that the conversation about terminating Plaintiff first came up "in February." (Oste Dep. 54:6–10.) Plaintiff also points to Mr. Oste's testimony as to the reason the decision to terminate her occurred at that point, namely that he "had [not] seen any improvement" in her performance at that point and he "realized that [Defendant] could function down a person." (*Id.* at 54:10–17.)

In contrast, Defendant argues the temporal proximity is not evidence of causation because "the decision to eliminate Plaintiff's position was made [in August of 2017,] three months prior to her FMLA leave." (Def.'s Mot. Summ. J. at 11.) As evidence of such, Defendant cites the written documentation from the August 2017 meeting stating "[r]ecommend letting Stephanie go." (Oste Dep. Ex. D.) Defendant also notes Mr. Oste's testimony defining the 2017 Strategy Saturday as setting the "plan for the year," not mere "brainstorming" as Plaintiff contends. (*Id.* at 40:2–4.) Finally, Defendant notes the document from the 2017 Strategy Saturday indicates the decision was not immediately communicated to Plaintiff because Defendant first needed to "hire a replacement for [Plaintiff]." (*Id.* at Ex. D.)

The Court agrees with Defendant that, if the decision to terminate Plaintiff was made in August of 2017, prior to Plaintiff applying for or taking FMLA leave, then Plaintiff cannot rely on the temporal proximity to prove a causal connection. *See Joiner v. Dep't of Transportation*, 949 F. Supp. 562, 569 (S.D. Ohio Dec. 19, 1996) (noting that "the protected activity must have

11

occurred prior to the alleged acts of retaliation"). It is unclear, however, whether the decision to terminate Plaintiff was made in August of 2017 or in early 2018.

Ms. Hoffer's 2017 Strategy Saturday document states that Ms. Hoffer "[r]ecommend[ed] letting Stephanie go" in August of 2017. (*Id.*) Plaintiff's repeated assertion that the 2017 Strategy Saturday was only "brainstorming" is not supported by the record.[5] Instead, the testimony indicates Strategy Saturday was something more formal than mere brainstorming. Mr. Oste testified that the session was a "plan for the year." (Oste Dep. 40:2–4.) Similarly, Ms. Hoffman testified it was a "business plan for the next coming year." (Hoffer Dep. 27:20.) The testimony shows that Strategy Saturday, in general, was more formal than brainstorming. This supports an argument that the decision to terminate Plaintiff could have been made at the 2017 Strategy Saturday. It is unclear, however, whether the document contained only a recommendation or whether the managers decided to terminate Plaintiff at that time.

Mr. Oste testified that he and Ms. Hoffer discussed their feelings that Plaintiff was not performing well before the 2017 Strategy Saturday. (Oste Dep. 63:11–19.) Mr. Oste also stated that at that time the managers decided they needed to "go another route" to fill Plaintiff's position. (*Id.* at 32:5–7.) He explained that Plaintiff was not fired immediately, because despite their feeling that Plaintiff "was [not] making the natural progression," in her job performance, there was not "any imminent decision to make. [Strategy Saturday] was a big picture meeting. [] [I]t was [not] like [the managers] sat down and said this is what we [are] doing tomorrow. [They said] this is what we [are] doing through the year to better build [the] team." (*Id.* at 37:6–10.) In contrast to

---

[5] Plaintiff calls Strategy Saturday a brainstorming session numerous times throughout her response. (*See* Pl.'s Resp. at 1, 2, 5, 17, 23.) Plaintiff, however, never cites or refers to any evidence on the record which supports this assertion. (*See id.*)

this testimony, however, when asked when the discussion about Plaintiff's termination "first came up", Mr. Oste testified this occurred "sometime in February" of 2018. (*Id.* at 69:2.)

Similarly, Ms. Hoffer testified that in August of 2017 she recommended terminating Plaintiff because she did not believe Plaintiff was going to be able to do the installation manager job. (Hoffer Dep. 121:15–19.) Ms. Hoffer explained that she waited until February to officially terminate Plaintiff because Mr. Oste "felt he could work with [Plaintiff] and ger her to a position where she would be able to step in and do [the installation manager] job." (*Id.* at 121:21–122:1.) Ms. Hoffer also testified the final decision was "probably [made] the day before [they] terminated Plaintiff," and thus, in February of 2018. (Hoffer Dep. 76:4–7.) Ms. Hoffer also stated, however, that she "knew as of August of 2017 that eventually, whenever was the right time for the business, Stephanie would be terminated." (*Id.* at 150:15–18.) Finally, Ms. Hoffer stated Mr. Henson gave his approval to terminate [Plaintiff] in August of 2017. (*Id.* at 150:6–8.)

The testimony does not clearly show whether the decision to terminate Plaintiff was made in August of 2017, or January or February of 2018. On a motion for summary judgment, however, "the facts must be construed in favor of the plaintiff as non-moving party." *Denton v. Fairfield Med. Ctr.*, No. 2:11-cv-716, 2012 U.S. Dist. LEXIS 87983, at *27 (S.D. Ohio June 26, 2012). Thus, the Court will go on to consider whether, if the decision to terminate Plaintiff was made in January or February of 2018, Plaintiff can make out a prima facie case of retaliation for purposes of summary judgment.

Defendant argues that even if the decision was made in early 2018, Plaintiff cannot establish a causal connection because temporal proximity, alone, is not enough to create a genuine dispute of a material fact. (*Id.* at 11.)

The Sixth Circuit has cautioned that in applying employment discrimination statutes that require determination of the defendant's motive, temporal proximity alone is unlikely to be enough to prove a connection between the protected behavior and the action taken against the employee. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010). Generally, "temporal proximity itself is insufficient to find a causal connection[,]" but when coupled with "other indicia of retaliatory conduct may be sufficient." *Randolph v. Ohio Dep't Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).

For example, in *Denton v. Fairfield Medical Center*, a plaintiff argued the defendant retaliated against her for taking FMLA leave. 2012 U.S. Dist. 87983 at *6. The plaintiff's only evidence was that she was fired three weeks after returning from FMLA leave. *Id.* at *1–2. This Court found this evidence insufficient for the court to conclude the plaintiff had alleged a sufficient causal connection. *Id.* at *7–8.

In contrast, in *Randolph v. Ohio Department of Youth Services*, the plaintiff argued she was subjected to retaliation in violation of Title VII when she was fired after reporting sexual harassment. 453 F.3d at 737. The Sixth Circuit found there was enough evidence to satisfy the prima facie case because Plaintiff had provided evidence of the temporal proximity of her protected conduct to her termination, "coupled with the fact that she was subjected to rumors about inappropriate behavior." *Id.* The plaintiff had provided evidence of temporal proximity coupled with other indicia of retaliatory conduct. *Id.*

In this case, Plaintiff was fired three weeks after returning from FMLA leave. Additionally, her performance did not become allegedly intolerable until she had taken FMLA leave. Even assuming the decision to terminate her was made sometime in early 2018, and not in August of 2017, the Court agrees with Defendant that this temporal proximity, alone, would be insufficient

to raise a genuine dispute of material fact. *See Denton*, 2012 U.S. Dist. 87983 at *7–8. Plaintiff argues, however, that she has provided evidence in addition to temporal proximity.

### b. Anti-leave Animus

Plaintiff argues Ms. Hoffer's comment to her regarding her use of leave is evidence of Defendant's anti-leave animus which shows a causal connection between her protected conduct and adverse employment action. (Pl.'s Resp. at 17.)

Plaintiff testified that in September of 2017, Ms. Hoffer "came out and told [her] that [she] had all of the time off that [she] was going to get and [the company was] not going to approve any more time [off]." (Gaiser Dep. 58:2–4.) Ms. Hoffer testified that during this conversation she said "I want to make sure that we have an understanding that going forward . . . you cannot assume to just take unpaid days of for personal vacation without talking to someone first." (Hoffer Dep. 139:18–23.)

The Sixth Circuit explained in *Ercegovich v. Goodyear Tire & Rubber, Company*, that while a discriminatory statement, standing alone, generally does not support an inference of discrimination, the comments are "not categorically excludable." 154 F.3d 344, 356 (6th Cir. 1998). This is because such a statement can be "[c]ircumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace," which, "may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Id.* The Sixth Circuit also clarified that that "evidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment." *Id.* (citing *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597–98 (1st Cir. 1987).

For example, in *Yazdian v. Goodyear Tire & Rubber Company*, the plaintiff argued he was terminated in retaliation for complaining about discrimination based on his ethnicity in violation of Title VII. 793 F.3d 634, 644 (6th Cir. 2015). The plaintiff argued the temporal proximity between the complaint and his termination as well as two discriminatory comments by his superior, made out a causal connection between his termination and his protected conduct. *Id*. at 650. The first discriminatory statement was an email in which the plaintiff's boss sent him a holiday gift card to the Honey Baked Ham store, but noted they also have good turkey. *Id.* at 640. The plaintiff took offense to this comment, believing his supervisor had singled him out because he was Muslim. (*Id.*) The second comment was a letter warning the plaintiff of inappropriate behavior which included as a supporting example, the plaintiff's comment to his boss that his boss was creating a hostile work environment. *Id.* at 642.

The Sixth Circuit found the temporal proximity, and the two discriminatory comments, were enough evidence to establish a causal connection between the protected conduct and his termination. *Id.* at 650; *see also Ercegovich*, 154 F.3d at 355 (finding non-decisionmakers' discriminatory statements about individuals over 50 years old "may reflect a cumulative managerial attitude among the defendant employer's managers," to discriminate against those over a certain age, and thus, supporting evidence of the plaintiff's prima facie case); *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (finding statements by co-workers regarding the capabilities of females, together with other circumstantial evidence, enough to show a causal connection).

The Court finds that the statement made by Ms. Hoffer could persuade a reasonable jury that Defendant had an anti-leave animus. The statement, especially as Plaintiff remembers it, evinces a hostile attitude towards the taking of any leave, arguably including FMLA leave.

Plaintiff testified she understood that she would be "in trouble," or "written up" for taking any more leave. (Gaiser Dep. 130:2022.) Thus, Plaintiff alleged a temporal proximity and other indicia of retaliatory conduct. [6] This is sufficient such that a reasonable jury could find Plaintiff has satisfied her prima facie case. *See Randolph*, 453 F.3d at 737

The evidence Plaintiff relies on, however, is circumstantial, for none of it *requires* a finding of interference. Thus, under the *McDonald Douglas* burden shifting framework, the Court must now move to Defendant's legitimate reason for its action. *See Donald*, 667 F.3d at 761–62.

### 2. Defendant's Burden: Legitimate Reason for Its Action

Defendant argues that even if Plaintiff can make out a prima facie case, her claim still fails because of Defendant's honest belief that Plaintiff had failed to perform the duties of the position she was hired for. (*See* Def.'s Mot. Summ. J. at 11.) Plaintiff was hired as an installation manager and was paid as such. (Oste Dep. 32:10–12; Hoffer Dep. 19:10, 53:16–19; Gaiser Dep. 34:9–10.) Upon hiring Plaintiff, Defendant intended for her to take over some of Mr. Oste's installation manager duties so he could perform duties outside of the installation department. (Hoffer Dep. 77:13–15.)

Defendant contends, however, that Plaintiff was not performing the duties of an installation manager. (Oste Dep. 31:19–20, 32:13–19; Hoffer Dep. 19:4–7, 82:5–6.) Instead, she was only performing the duties of an installation assistant. (*Id.*; Hoffer Dep. 125:10–12.) Thus, she was being paid for a position she was not performing. (Oste Dep. 31:21-24.) Further, she had failed to take any of Mr. Oste's duties. (Hoffer Dep. 77:13–14.) Finally, neither Mr. Oste or Ms. Hoffer

---

[6] In Plaintiff's argument for her prima facie case, Plaintiff also mentions her "unquestioned" job performance as evidence of a causal connection. The Court finds that the temporal proximity and Ms. Hoffer's comment are enough to establish a genuine issue of material fact regarding the prima facie case. Plaintiff's argument regarding her job performance, which she also makes in connection with showing pretext, is better used as an argument for pretext and the Court considers it there. *See infra* Section III.A.3.

believed she would ever be able to perform the duties she was hired to perform. (Oste Dep. 32:2–5, 36:2–23, 63:11–15; Hoffer Dep. 121:12–18.)

Due to Plaintiff's failure to perform the manager duties, Defendant determined it could function "down a position," and thus, eliminated Plaintiff's position. (Oste Dep. 54:16–17.) Plaintiff's position was not re-filled for many months after it was eliminated. (Oste Dep. 69:23–70:5; Hoffer Dep. 131:3–9.)

Based on all this evidence, Defendant has satisfied its burden to provide a non-discriminatory, legitimate reason for Plaintiff's termination. Accordingly, the burden now shifts to Plaintiff to show the articulated reason is in fact pretextual. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

### 3. Plaintiff's Burden: Defendant's Reasons are Pretextual

Plaintiff argues that Defendant's reasoning for terminating her are pretextual because they did not actually motivate Defendant's action. (Pl.'s Resp. at 16.) To support this argument Plaintiff provides evidence of temporal proximity, Ms. Hoffer's anti-leave comment, and Plaintiff's "unquestioned" job performance. (*Id.* at 22.)

"A plaintiff may show that the legitimate non-discriminatory reason given by the employer is a pretext for discrimination by showing that the reason given (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Walker*, 2015 U.S. Dist. LEXIS 48335 at *28 (citing *Clay v. UPS*, 501 F.3d 695, 704 (6th Cir. 2007)). Importantly, "consideration of pretext focuses on the defendant's beliefs and not on the plaintiff's own perceptions." *Id.* The plaintiff bears the burden of producing sufficient evidence from which a jury could reasonably reject the defendant's explanation and infer

the defendant intentionally discriminated against the plaintiff. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

Plaintiff first points to the temporal proximity between her use of FMLA leave and her termination, and Ms. Hoffer's discriminatory comment. The Court has already laid out the evidence Plaintiff provides in support of these two arguments. *See infra* Section III.A.1.a; Section III.A.1.b. In addition, Plaintiff points to the circumstances surrounding her performance.

Plaintiff points out that while Defendant claims it terminated Plaintiff because she did not perform at a level consistent with her salary, Mr. Oste, Plaintiff's direct supervisor, never addressed a concern about underperformance with Plaintiff. (Oste Dep. 32:22–23, 37:17, 53:3.) Additionally, the primary tool Defendant used to evaluate its employees' performance, the GTRS, never addressed her alleged performance deficiencies. (*See* Gaiser Dep. 87:11–13.) Mr. Oste testified that in regard to an employees' GTRS, "if there was a concern that needed addressed, we would have a conversation" with the employee. (Oste Dep. 16:21–23.) Mr. Oste also testified that "[i]f there [are] things [he] wants [his employees] to accomplish, [he] will say, I want you to put this in [the GTRS] to work on it." (*Id.* at 19:2–5.) Mr. Oste, however, told Plaintiff her GTRS was "fine" and "did [not] give [her] any constructive information or issues" relating to it. (Gaiser Dep. 87:11–13.) In addition to not being told she was underperforming, she was given a raise and two bonuses. (Gaiser Dep. 134:8.) Similarly, she was given the duty to train another employee, Mr. Woods. (Woods Dep. 59:13–15.)

Plaintiff also points out, she never received any training or development opportunities. (Oste Dep. 35:17–20.) Mr. Woods, another employee performing installation assistant duties, however, did get training and development opportunities. (Woods Dep. 18:23–19:9.) Instead of

addressing Mr. Oste's concern with Plaintiff, or giving her training, Mr. Oste gave her "busy work." (Oste Dep. 35:12.)

Finally, Defendant never assigned the tasks to Plaintiff which it now complains her failure to perform justified her termination. (Oste Dep. 34:23–24.) Mr. Oste testified that Defendant's managers "did not give her the responsibility to" make the type of decisions an installation manager would. (*Id.*) Mr. Oste also testified he never gave any of his work to Plaintiff. (*Id.* at 35:23–24.)

To rebut Plaintiff's argument of pretext, Defendant contends only that Plaintiff cannot prove pretext because temporal proximity is not enough to overcome its legitimate nondiscriminatory reason for her termination. (Def.'s Reply at 10–11.)

The Court agrees with Defendant that temporal proximity, alone, is not enough to create a genuine issue of material fact as to whether the reasons provided by the defendant are pretextual. *Carey v. ODW Logistics Inc.*, No. C2-08-0581, 2010 U.S. Dist. LEXIS 13059, at *15–16 (S.D. Ohio Feb. 16, 2010) ("The only evidence that [the plaintiff] has adduced to show his termination was pretextual is temporal proximity. While this might be enough to establish a prima facie case, it is not enough to defeat pretext or to create a genuine issue of material fact as to whether [the defendant's] reasons were pretextual."); *Heady v. United States Enrichment Corp.*, 146 F. App'x 766, 770 (6th Cir. 2005); *Skrjanc*, 272 F.3d at 317. In this case, however, Plaintiff offered evidence not only of the temporal proximity of her termination to her use of FMLA leave, but also of Ms. Hoffer's comment, and evidence rebutting the claim that Plaintiff was underperforming.

Plaintiff has provided evidence that creates a genuine dispute of material fact as to whether Defendant's stated reasons for its actions have a basis in fact, actually motivated the employer's challenged conduct, and whether the information Defendant relied on was sufficient to warrant its

conduct. *See Walker*, 2015 U.S. Dist. LEXIS 48335 at *28. Having failed to show there is no genuine dispute of material fact as to whether its reasoning for taking action against Plaintiff was pretextual, Defendant is not entitled to summary judgment on Plaintiff's interference claim.

## B. FMLA Interference Claim

Plaintiff's Complaint alleges an interference claim stating that "[b]y failing to restore [Plaintiff] to her former position or a position with the same or substantially similar duties and responsibilities following her FMLA leave beginning in November of 2017, Defendant violated the FMLA." (Compl. ¶ 50.) Defendant's motion contends it is entitled to judgment "on all claims asserted," and advances an argument for both of Plaintiff's claims. (Def.'s Mot. Summ. at 1.) Plaintiff, in her response, asserts only that there is a genuine dispute of material fact as to her retaliation claim. (*See* Pl.'s Resp. at 1, 16–23.) In its reply, Defendant argues that because Plaintiff has not disputed Defendant's analysis as to her FMLA interference claim, Defendant is entitled to summary judgment on this claim. (Def.'s Reply at 8–9.)

The Court finds that Plaintiff has abandoned any claim to FMLA relief on a theory of interference with FMLA rights by "failing to address this theory in responsive briefing." *Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S.D Ohio Oct. 19, 2005). "Plaintiff is therefore barred from relying on an [interference] theory for the remainder of this litigation." *Id.*; *see also Conrad v. Bank Nat'l Ass'n*, 391 F. Supp. 3d 780, 791–92 (S.D. Ohio June 19, 2019) ("[The plaintiff] does not refute [the defendant's] characterization of [the claim], nor does [the plaintiff] respond in any way to [the defendant's] argument that this claim should be dismissed. Thus, [the plaintiff] appears to concede this point and waives opposition to dismissal of this claim); *see also Woods v. U.S. Bank Nat'l Ass'n*, No. 517CV2234, 2019 U.S. Dist. LEXIS 44901, at *6–7 (N.D. Ohio Mar. 19, 2019) ("A party waives opposition to an argument by failing to address it in her

responsive brief . . . the [c]ourt is not required to consider the[] merits and may grant judgment in [the moving party's] favor."); *Ohio Star Transp., LLC v. Roadway Express, Inc.*, No. 2:09-cv-261, 2010 U.S. Dist. LEXIS 95764, at *10 (S.D. Ohio Sept. 14, 2010) ("[The defendant] raises this argument, but [the plaintiff] does not respond, thereby waiving its ability to challenge the argument and effectively conceding the point.").

## IV.

For the reasons set forth above, the Court **DENIES** Defendant's Motion for Summary Judgment (ECF No. 14) as to Plaintiff's claim of retaliation for the exercise of FMLA rights. The Court also holds Plaintiff has abandoned any alternative theory of FMLA relief based on interference with an FMLA right and may no longer rely on this theory.

**IT IS SO ORDERED.**

1-27-2020
_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**